The final case for argument is 13-312A, Guzman-Muelling v. SSA Mr. Gagliardo, I massacred the name of your client, so you might give us that again. My client's name is Guzman-Muelling. She refers to herself as Guzman alone, just Guzman. As you know, this is a review of an arbitrator's decision, and there are two primary contentions raised on appeal. The more direct one, the simpler one to analyze, is that the arbitrator wholly ignored the claim that the charges of misconduct brought against Ms. Guzman violated the collective bargaining agreement, specifically Article 23, Section 2, which says that charges have to be brought timely. That issue was raised throughout the grievance procedure. It's referred to in the decision to remove Ms. Guzman, but it's wholly ignored by the arbitrator. We submit that this matter, if nothing else, should be remanded to her for a determination on that issue. The second issue is a bit more complex factually, and that is whether or not the conclusions of the arbitrator are supported by substantial evidence. Now, giving an overview of the arbitrator's decision, she ignored entirely agency admissions that Ms. Guzman's conduct was proper rather than improper. Secondly, she ignored the agency's failure to even reprimand Ms. Guzman at the time that these instances occurred. That goes also to the timeliness issue. Okay, so let's go to the timeliness issue. The contract doesn't specify a particular time, correct? Correct. So it's just reasonable, timely, initiated in a timely manner? One could hardly say otherwise, Your Honor. I'm sorry? One could hardly say otherwise. It's a reasonableness issue. Okay, and here we're talking about what? It was October, one year, until May of the following seven months? It varied. I put in a footnote the exact time limits by day as to each one of the charges, either when it actually occurred or perhaps more fairly when it actually became known to the agency. I'm not sure, I guess. It seems to me, let me just argue with you for a second. It seems to me that what we and appellants such as your client strive for is that the agency won't rush to judgment, that the agency will look at an employee's cumulative record and what goes on in a period of months, whether this is just a once-in-a-lifetime thing or whether this is part of a pattern. And it seems to me that if you play out how things evolved here, it seems perfectly reasonable for the agency to have taken its time. There were a number of instances that were alleged to have gone, and particularly in evaluating whether or not removal was appropriate, you looked at the pattern of conduct here. So why is that a compelling argument that there's a violation of the contractual provision to rely on? Because the arbitrator doesn't, we can't suppose. It's the arbitrator's judgment. And the arbitrator has to look at what the practice of the parties are. The arbitrator has to look at whether or not there are other arbitral decisions, although there's controversy about how binding or non-binding. Well, if the arbitrator looked, did you present other decisions that went the other way on the contract? The arbitrator doesn't have the burden in the case. No, we argued, but we did argue quite strenuously that these were untimely and that they were unduly delayed. While it's true that one doesn't want to rush to judgment, on the other hand, one doesn't want to allow charges to become stale. What's important in the discussion, regardless of which side of this argument you're on, is that these things were known shortly after their occurrence to the agency. And they, in fact, did go to Ms. Guzman and say, what is your side of the story? And she gave a presentation. She said X, Y, or Z. And the agency then says nothing, says nothing. We pointed this out in our brief. They didn't reprimand her. They didn't say, you know, you're doing this wrong. They didn't say, if this continues, you're in deep trouble and you can lose your job. We have testimony from the direct supervisor that she never even said to her, you know, if these problems occur, come to me, I'll help you, I'll show you a better way to handle these things. They left these matters totally unaddressed. What's the implication of that behavior by the agency? The implication is one or both of the following. That they agreed with Ms. Guzman that events occurred as she represented them, and therefore they were not violations. It was not rude treatment of the client. It was not a violation of the procedures of the Social Security Administration. The second implication is that even if it's true, it's not serious. If it were serious, they would have so noted. You can't lie and, I mean, to be hyperbolic about it, you can't lie in wait. You can't rush to judgment, but you can't lie in wait. You know, fair is fair. That's why there's a provision about timely notice. There's a separate provision about bringing matters to the attention of an employee as promptly as possible so the employee fresh recollection of events, availability of other things that might exonerate the person and refute the accusation that's been made. So that's why we think that the timeliness issue was improperly ignored by the arbitrator. I hope I've answered your question. If I may then continue. The arbitrator also ignored Ms. Guzman's uncontroverted testimony in several regards. She ignored the motives that the claimants might have had in making complaints, and just to address that very briefly, in virtually every single case, if not in every single case, Ms. Guzman delivers, let's just call it negative information, to the member of the public. She says, you don't qualify for this. I can't use that deduction. I have to do this. And they're unhappy with those decisions. In one particular case involving, you know, I try to keep names confidential, but they seem to have been spread throughout the record, so I'll no longer do that unless the court instructs me otherwise. A case involving Mr. Aceves. Mr. Aceves says, Ms. Guzman insisted that I come and see her on a Monday morning. And I had a medical appointment that day, and I had to cancel it, and so I'm lodging a complaint. Well, what motive does Ms. Guzman have to schedule him on Monday or Tuesday or any other day? She's there five days a week. But you are asking us to do precisely what we are not allowed to do, which is go through each of these scenarios and assess the credibility of one person's version of the facts versus another, and evaluate what their motivations would have been to tell one story rather than another, and how can that be within the realm of what we're doing here on the appeal? I'm not asking you to do that. What I'm saying to you is that this arbitrator ignored so much evidence, so much exculpatory evidence, drew such unreasonable conclusions based on the totality of the evidence that this does fall within the court's jurisdiction to set aside a decision that's not based on substantial evidence. I understand substantial evidence is a low bar for the prevailing party, and it's a high bar for the challenging party. But in this case, if you look at the totality of this, let me give you another example of how off-base, if I may use the vernacular, how off-base this arbitrator was, and therefore why it's proper to conclude that she did not look to substantial evidence. She says this employee, Ms. Guzman, couldn't get along with co-workers. Three co-workers come in and say she's a great co-worker. She refers to an incident that occurred four years prior, and she refers to equal employment opportunity complaints that are settled by the agency that occurred more than a decade prior. That's offensive. To say evidence of not getting along with your co-workers is that you filed and settled equal employment claims? I mean, this arbitrator is not being reasonable. She's not looking at the evidence. She's not weighing exculpatory against inculpatory. So I was thinking of analogies that I might draw. If a lawyer has in his or her office a set of certificates that say he or she is admitted to the Supreme Court, every federal circuit court, and so on and so forth, and one draws the conclusion this is a preeminent lawyer, on those facts alone it may so appear. But when you talk to this lawyer's colleagues and you say, no, this lawyer really isn't very good, really hasn't done very many cases and hasn't done very well in the cases that he had, then you'll come to a totally different conclusion. And you can't say that just because she can point to an accusation, an affidavit, even an affidavit under oath, which she does point to, that that's substantial evidence on which she can draw her conclusion, unless you also look at the evidence that she ignored. And that's my plea to the court. Let me ask a separate question, because we notice in the record states and the government tells us that there have been assorted disciplinary steps over the years of Ms. Grissom's entire career. Correct. Has there been anything such as what we've seen in other contexts called a performance improvement plan or some kind of structure to take into account whatever it is that seems to have caused these flare-ups? The first answer is no, there is not such evidence. In fact, it's the opposite. Again, the immediate supervisor, Ms. Velazquez, was asked, did you suggest any classes? Did you suggest any remedial steps? And the answer is no, I did not. Did you suggest to sit with her? Did you suggest to mentor? There were a whole series of questions that are outlined in the brief, and the answer to all those questions is no.  She was never put on any kind of probation. The prior discipline, I might just point out if I may, the very first was a three-day suspension in 1998, 13 years before this occurred. It had to do with following instructions about batching records. Ms. Guzman had her version. The agency had its version. And all of these things had been scheduled for arbitration but were never taken to arbitration, and so they were never fully resolved. Then in 1999, which is 12 years before, I see I'm running out of time, 12 years before, she gets a 10-day suspension because she allegedly didn't offer a seat to a claimant. A claimant that she assisted in an extraordinary way would come in. There was a question about whether someone had died. Ms. Guzman took it upon herself to get the funeral home on the phone, get the death certificate, and process the claim. Yet she was disciplined for that. And then she was given a 30-day suspension because she allegedly didn't request official time to engage in union duties. So the first and the third offenses are totally unrelated to the issue of why she was removed. All three of those disciplines closely followed her filing of the EEO claims, and all three were imposed by the same supervisor, a woman by the name of Mary Sauber. So the past record, which the arbitrator seems to rely on heavily, is really grossly misinterpreted, and I would say in the language of the reviewing courts, it's an unreasonable interpretation. And if you look at the way she analyzed other Douglas factors, you find the same kind of unreasonable conclusions that are drawn. I mentioned before, she says Ms. Guzman couldn't get along with her coworkers, citing a single incident four years prior and ignoring three coworkers at the time who laud Ms. Guzman. You know, the integrity of the arbitration process is also at issue here. I mean, as with any, I mean, every court, every decider of what is just and what is fair has to have the confidence of the people that come before it and adjudicate claims before it. This arbitrator denigrates the arbitration process in her extreme conclusions and her ignoring of evidence. Well, you're in field battle time, so why don't we hear from the government. Thank you, Your Honor. May it please the Court. Ms. Guzman's primary job responsibility as the claims representative was to interview members of the public and assist them in seeking their benefits. What about this timeliness argument and the notion that she was not, she went on doing all of this stuff, she knew these supervisors were aware that she had done this, but she thought it was okay because nobody had kind of stopped her in her tracks and said, we've got to do some discipline or something. Yes, Your Honor. She was spoken to after each complaint to give her side of the story. At that point in time, she was put on notice of the public's perception of her, and repeatedly these complaints echoed each other, that they were perceiving her as rude, arrogant, disrespectful, and Ms. Guzman was aware of specifically how a claims representative is required to treat members of the public. Did she have a basis for believing that when this was called to her attention that her supervisors continued to feel that this was not acceptable behavior, or was she to think after everything happened and she responded that they went back and said, okay, with us. They did not specifically warn her at those times or reprimand her, but they were deliberating during that time. After the first complaint, the district... So then without a warning or a reprimand, how are we to put into context these events, particularly some of the time aspects that counsel has pointed out, the relationship to filing an EEOC complaint and other actions? How does one penetrate and how does the government indeed oversee the action of agencies, especially a large agency such as this one, whose responsibility is to deal with the public? If in fact there were no reprimands, there may have been suspensions, but in terms of what we usually see is the performance improvement plan is quite specific as to what's expected and what's to be done and what the time frames are. Yes, Your Honor. Apparently that never happened. Yes, Your Honor. Her supervisors took into account her previous disciplinary history with the suspensions, and they determined after this first complaint came in that Ms. Guzman's behavior had demonstrated that she could not be rehabilitated. They had already gone through informal efforts to counsel her, to send her to training, to learn how to work with the public. What time or frame were you talking about? It was prior to that complaint, but this had been an ongoing issue that District Manager Littner testified to, that he was working with her over time in a more informal way to improve her performance. That's not in the record before us. It's in the transcript. This is a 20-year employee. When it's finally made that perhaps this employee needs more drastic action, from what we see coming to us on appeal, it's highly irregular to say, without any kind of performance plan or period to see if rehabilitation, as opposed to some sort of drastic consequence, is feasible. I didn't see that in the record. You say it's in the transcript? That prior to the first complaint, District Manager Littner testified that he had been working with her. I'm talking about the issue, that which precipitated the decision of removal is what's before us, right? Correct. After the first complaint, and District Manager Littner did speak to that particular individual, Ms. Gambrill, who complained. After that, he deliberated. He wanted to spend a lot of time pondering what penalty to take, because he did not take removal lightly. He wanted to investigate, consult with the regional office. As he was investigating the first complaint, the second one rolled in, and then the third one rolled in. Through this time period, he wasn't able to institute a penalty, because he was still deliberating what penalty would be issued against her. That is why there was no formal reprimand or warning, because the penalty was being deliberated. Can I ask you, am I understanding correctly, as to the Article 23 timeliness argument? First, it was made to the arbitrator, and second, there is no sentence in the arbitrator's decision that addresses it. Yes, that's correct. The timeliness issue was presented to the arbitrator, but she found that counseling, whether it was done informally in their meeting, talking about this complaint, did satisfy that provision of the collection order. That's what I want to ask you about. Where does the arbitrator say, and I know that the arbitrator talks about counseling and so on, and the penalty analysis of why it's time for removal, other things haven't worked, but does the arbitrator actually address the timeliness question? Not specifically, no. But in going through the Douglass factors, she does state that the agency met counseling, short-term, intermediate, and long-term penalties, and that removal is the next appropriate penalty. But she does not specifically address the length of time between the complaint and the proposal for removal. If the Article 23 standard is one of reasonableness, and maybe reasonableness does actually depend, to some extent, on either informal counseling in the interim, because you don't want to force an agency to an all-or-nothing, too-early choice, maybe it has to do with considering cumulative effect of things. But if it's a reasonableness determination, and the arbitrator didn't actually address it, don't we have to remand for that to be addressed? I guess, tell me why it would be wrong to say, the alternative would be to say, this is timely as a matter of law. There is no finding that could go the other way. Or would it somehow not make a difference, somehow, that even if there were a timeliness determination, an untimeliness determination, the ruling would be the same? I guess I'm struggling. When an issue has been raised and simply not addressed, if there's a factual component, we can't make that determination. Yes, Your Honor. The arbitrator did mention it in her decision when she was going through petitioner's side of the argument, but she did not explicitly resolve it in her decision. But we can look to the implicit resolution, because she did not say that the length of time was unreasonable. So she had this issue before her, and she did not specifically find it to be problematic. And the arbitrator is not required to go through every minute piece of evidence in reaching the decision. And now, substantial evidence does support the arbitrator's conclusions. She considered the written complaints by the individuals who had appeared before Ms. Guzman, as well as testimony from her supervisors and Ms. Farrell, one of the individuals who complained, as well as her coworkers. Now, the quantity of these complaints also support the decision, because they were in a short period of time and followed each other very quickly and mirrored each other in their substance. These individuals repeatedly described her as rude, disrespectful, arrogant, speaking over them, interrupting them, and she gave weight to the similarity in substance. But isn't it troubling? Here, all of this information is deduced finally when the decision of removal has been made, and yet there has been no formal structure for review and demonstration of improvement or else. At that point, they had already found her to be beyond rehabilitation, that it would not be possible for her to continue her job working with the public with such... Beyond rehabilitation is quite a dramatic psychological judgment. I don't see that in the record. As they go through the Douglas factors, they determine that she cannot be rehabilitated because of her interactions with the public, and that this position, 80 to 85 percent of the time, is interactions with the public. So after 20 years of employment, you're saying that the Douglas factors weigh against saying, All right, you have three months to shape up or else. Or whatever. Some kind of notice and opportunity. The Douglas factors cumulatively look at the circumstances, and on review here, we are looking at whether there is any evidence for the agency to... Whether there's substantial evidence to affirm what the arbitrator decided. Ultimately, the arbitrator looked at those Douglas factors and found... Which Douglas factor are you relying on? I'm relying upon an arbitrator's decision. Which Douglas factor? You've been telling us the Douglas factors... Number 10. ...or require that there be no period of rehabilitation or attempted rehabilitation. I'm looking at Douglas factor number 10, the potential for the employee's rehabilitation. This is where both the arbitrator and the agency determine whether, based on these circumstances, she would be able to improve in her relations with the public or not. So after 20 years of apparently fairly consistent behavior that has occasioned complaint, all of a sudden after 20 years, it's appropriate for the agency, without notice, to say there's no possible remedy? Well, according to the collective bargaining agreement, the agency determined that they had met progressive discipline by doing short-term suspension as well as longer, incremented suspension. She wasn't given a short-term suspension. She was fired. In this particular situation, but the agency did look at the entire range through the length of her federal career in making that ultimate determination, as well as their personal experience with her. That's not logical, what you're telling us. You're saying that these egregious events took place in the past, but there was no significant discipline, no notice, no, again, shape-up-or-else alternative? The agency viewed the length of her career and felt that they had given her those notices, that she was on notice about the requirements of her position, and as these complaints came in, they felt that she was not meeting those requirements of her position. A complaint every five years? Pardon me? You say as the complaints come in, it's a complaint every five years or so. You're saying this is a consistent pattern of incompetence? District Manager Littner testified in the arbitration that Ms. Guzman had the technical expertise, but that at certain moments, her mood and disposition interfered with that expertise, and that is when she did not perform her job up to the standards required of her position, and that he had been working with her over a number of years to improve those issues, and they spoke about it at their mid-year evaluations, and that he had arranged a training to deal with members of the public, that he had done that specifically geared towards her, and this is what he testified to in the arbitration. So at the point in time when he proposed removal, he did look at that entire history of his experience with her. Can I just ask you, can you point me to where in the arbitration, this is again on Article 23 and the timeliness provision, I think you had said that in the description of the union's argument, that I see there's obviously a quote of Article 23, where is the reference specifically to the timeliness portion of it? Well, I think on page 27, it doesn't specifically mention it in the context of the collective bargaining agreement, but it does mention this length of time between October and the notice of removal. Do you remember, does the appendix contain Ms. Guzman's argument to the arbitrator on this point? Yes. On page 27 of the decision, when it's summarizing the position of the union, the arbitrator does not specifically in her decision analyze provision 23 in that context. Okay. Apart from progressive discipline, which she finds was met, but not in terms of the response. Well, I guess I'm a little confused now, just looking at the, what we're talking about here is what, Article 23, Section 2? Yes. But where the arbitrator, if I'm looking at the right document, on page 23, cites the contractual provisions, the relevant contract provisions. Am I looking at the right document, page 23? She cites Section 1 of Article 23, but not Section 2. Or is that, am I missing something? Yes, she is citing Section 1. She did not cite Section 2. Well, how do we know that the other side, I mean, is it clear that the other side presented that argument? Is that, where in the appendix can we find, I mean, this is more a question for your friend than for you, maybe, but where can we find the presentation of that argument to the arbitrator? I don't have that specific appendix item. I'm not sure if it was in the transcript or not, or simply in the briefing. Well, we can ask. I'm not sure that the brief provides a citation for where that argument was made, which could explain why the arbitrator didn't say anything about it, if that's the case. In conclusion, we request that this Court affirm the arbitrator's decision. Thank you. Thank you. Thank you, Your Honor. Article, I mean, page 27, the arbitrator's decision is a summary, not complete summary, of the union's position where there is some implication of timeliness. You know, opposing counsel often say to me, let's include the arbitration briefs in the appendix, and I usually say, well, why? You know, the Court's, it's, you know, not necessary. Now I wish we had, because that would definitively answer the question. I looked before coming here today for my brief thinking it was in the appendix, and it is not. So, but timeliness was implicit throughout the whole case. It was a major part of the response to the proposal, and if you look at the decision to remove, which is found at 76 of the appendix, it's mentioned almost in the first discussion of the merits of the accusations. It's page, it is on page A76. It says your representative, Ms. Joseph, stated that the charges in Mr. Littner's proposal notice are without merit. She stated that the alleged misconduct in these cases occurred more than a year ago prior to the proposal, and that the length of time which has elapsed shows management's lack of conviction, et cetera, and so forth. Yeah, but that doesn't go to the heart of what I had understood to be the contractual argument. Well, here's the contractual argument. I think Your Honor was on to it. It is Article, excuse me, Section 2 of Article 23, which is not addressed by the arbitrator. It's explicit. If the agency feels that disciplinary or adverse action is necessary, such action will be initiated timely. Okay, I just, can I just, where do we have it, what document exists that would show that the union before the arbitrator, not before the agency, but that the union pressed that issue of a violation of that particular section of the contract be to the arbitrator? The worst question is the one that the answer is to. I don't know. I'm not, I thought it was in the record because I thought the brief was in the record. When I discovered it was not. You know, whether it's in the transcript pages that have been included, there's some discussion of that. I cannot honestly tell you because I don't know. I'm sorry. I'd like to point out just two. Well, is it your position that it was? Yes. You just can't support it because where is it like in the response to the, there's some of your filings here and I guess I'm not seeing where, is your response in the appendix? It may be in the opening statement actually. Are you talking to the response to the proposal? Yes. No, it's not in the joint appendix. I'd have to look, Your Honor, and I do apologize. This is indeed embarrassing. I might have said something in the opening statement about timelines. I'm trying to find it too. May I just make two quick points before my time totally runs out? There was an annual performance evaluation, as I'm sure the Court is well aware, and they occur in October of every year. If my arithmetic is correct, 10 of the 13 offenses alleged occurred in a period for which a performance evaluation is given and it was a fully satisfactory performance evaluation, including interpersonal relations, which includes not only in a relationship with your co-workers, but with the public. Then I'm missing something in terms of the timetable here because I thought quite a number of the allegations of her misconduct occurred in the fall of 2010 and in the spring of 2011. Correct. And then she was fired, so those would have shown up in her 2011 performance appraisal, not in her 2010 performance appraisal. I assume she didn't get one in 2011. Obviously, I may be wrong in terms of the timetable. I know I outlined in the brief the timing. Maybe I'm wrong about that, to be candid. But I thought when I looked this morning that they occurred during the period of the performance appraisal. Some of them may have been in September 2010. It's in the blue brief. I'll show you where you're on it. Here it is. It's page 12 of the brief. They occur July of 10, June of 10, June of 10, September of 10, October of 10. I think those are all the months. And one, there was an allegation that something had happened in September, although I think it was a minor part of the chart. Okay, so your point is that at least those that occurred before October of 2010 were not included in her performance appraisal in October of 2010? Correct. Do we have that in the record? The performance evaluations are in the record, yes. Can you just remind me on... Or if they're not in there, I know we've referred to them. And I pointed out in the brief that the arbitrator said, well, this is just social promotion. And she kind of brushed it all off as if it didn't matter what you got on your performance evaluation. Were some of the, I guess, the June-July incidents one that, although they occurred in June and July, weren't brought to the agency's attention until sometime later, and if so, how much later? I didn't mean to cut you off here. Only one of them was brought to the attention of the agency late. Okay. It was... That was the January 2011 one. Yes. On page 12, I note that. It says, charge one, inappropriate behavior towards members of the public. One, June 3 and September 2011, reported January 13, 2011, involving J.R. You know, I can comment on that, but given Judge Prost's earlier comment, I won't go into the detail of why. I think there's a concession by management saying that Ms. Guzman actually performed properly. Can I ask you, before you sit down, if you could provide us in the next day or two a copy of your submission to the arbitrator? Absolutely. And perhaps... And in fairness to the agencies as well. So if you can provide that. I appreciate that opportunity. And nothing other than what was actually submitted to you. Of course, of course. I have to... If we're done, if I can say something, I finally figured out how the clock works. Which you can see here. Well, in the Fourth Circuit... Yes, I do. In the Fourth Circuit, your principle time is measured differently than your rebuttal time. So, you know, when I look at the clock and it says two, I think I have two more minutes of principle time when rebuttal time is sitting over here untouched. I finally figured it out. And I've only been here twice this summer. Can you go next time? I thank both counsel. The case is submitted. That concludes our proceedings for this morning. Thank you very much. All rise.